<u>FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THE IQ GROUP, LTD. d/b/a INSURANCE IQ, | : : | |
| Plaintiff, | : : | Civil Action No. 03-5221 (JAG) |
| v. | : : : | **OPINION** |
| WIESNER PUBLISHING, LLC t/a ADVISORS DATA SOURCE and t/a IT BUYERS, and LISA HULAC; ERIC BENDER; NATIONAL SENIOR ASSOCIATES COMPANY, LLC; CAPITAL CARE, INC.; and JOHN DOES 1-100, | : : : : : : : : : | |
| Defendants. | : | |

APPEARANCES:

Stanley W. Kallmann, Esq.
Gennet, Kallmann, Antin & Robinson, P.C.
6 Campus Drive
Parsippany, NJ 07054

ATTORNEYS FOR PLAINTIFF IQ GROUP, LTD.

Louis J. Seminski, Esq.
Landman Corsi Ballaine & Ford P.C.
One Gateway Center, Suite 400
Newark, NJ 07102-5388

Timothy P. Getzoff, Esq.
Holland & Hart LLP
One Boulder Plaza
1800 Broadway, Suite 300
Boulder, CO 80302

ATTORNEYS FOR DEFENDANT WIESNER PUBLISHING, LLC

**GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on the Motion for Summary Judgment by Defendant Wiesner Publishing, LLC ("Wiesner") and the Cross-Motion for Summary Judgment by Plaintiff IQ Group, Ltd. ("IQ"), pursuant to FED. R. CIV. P. 56.  For the reasons set forth below, Defendant's Motion will be granted in part and denied in part.  Plaintiff's Cross-Motion will be denied.

## INTRODUCTION

These motions arise in the context of a dispute between business competitors.  IQ and Wiesner are businesses that provide advertising services for insurance companies: they send ads by email to insurance agents.  In 2003, National Senior Associates Company, LLC ("NSAC") and Capital Care, Inc. ("Capital Care"), insurance companies, both hired IQ to send advertisements.  NSAC and IQ dispute who created the ad for NSAC, and thereby who is entitled to claim authorship and hold the copyright.  IQ distributed copies of ads for Capital Care and NSAC via email to insurance agents; the ads sent by IQ displayed a graphic described by IQ as a logo.  The IQ logo consists of the outline of a capital "Q" with the outline of a lower-case "I" in the center.  Both outlines are shaded, as if in graphical relief.  The ads also contained a hyperlink that, when clicked, directed the user to a page of IQ's website which IQ claims contained copyright notices.

After IQ had distributed the NSAC and Capital Care ads, both NSAC and Capital Care hired Wiesner to distribute the ads via email.  Both NSAC and Capital Care provided Wiesner with the ads that IQ distributed.  Wiesner removed the IQ logo and hyperlink, added new information so that responses to the ads would go to NSAC and Capital Care, and then copied

and distributed the ads via email.

IQ subsequently applied to the U.S. Copyright Office for copyright registration, claiming authorship of the NSAC and Capital Care ads. IQ obtained copyright registrations as of October 22, 2003. IQ then filed suit against Wiesner, NSAC, Capital Care and other parties, stating claims for: 1) slander, libel and conspiracy to defame IQ (Count 1, against Wiesner et al.); 2) negligence in making false and damaging statements (Count 2, against Wiesner et al.); 3) breach of contract (Count 3, not against Wiesner); 4) copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA") (Count 4, against Wiesner et al.); 5) tortious interference with business relationships (Count 5, against Wiesner et al.); and 6) copyright infringement and violations of the DMCA (Count 6, not against Wiesner). Subsequently, IQ conceded that it is not entitled to statutory damages for copyright infringement related to the Capital Care ad. (Pl. Mem. Opp. Mot. S.J. 16.)

The instant motion and cross-motion for summary judgment concern the claims of copyright infringement and violation of the DMCA. Wiesner filed a motion for summary judgment on these issues: 1) IQ is entitled to a maximum of one award of statutory damages for copyright infringement of the NSAC and Capital Care ads; and 2) IQ's DMCA claims, for violation of 17 U.S.C. § 1202, should be dismissed as a matter of law. IQ filed a cross-motion for summary judgment on these issues: 1) Wiesner has infringed IQ's copyright on the NSAC ad; 2) IQ is entitled to statutory damages for Wiesner's infringement of the copyright on the NSAC ad; 3) IQ is entitled to increased statutory damages for Wiesner's willful infringement of the copyright on the NSAC ad; and 4) Wiesner violated the DMCA, 17 U.S.C. § 1202, with regard to both the Capital Care and NSAC ads.

## ANALYSIS

**I.      Governing Legal Standards**

     A.      <u>Standard for a Rule 56 Motion for Summary Judgment</u>

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1366 (3d Cir. 1996). In making this determination, the Court must draw all reasonable inferences in favor of the non-movant. <u>Hullett v. Towers, Perrin, Forster & Crosby, Inc.</u>, 38 F.3d 107, 111 (3d Cir. 1994); <u>Nat'l State Bank v. Fed. Reserve Bank of N.Y.</u>, 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. <u>Jersey Cent. Power & Light Co. v. Lacey Township</u>, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990); <u>see</u> <u>also</u> FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23). In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences – including on issues of credibility – in favor of the non-moving party. Watts v. Univ. of Del., 622 F.2d 47, 50 (3d Cir. 1980).

**II.  Defendant's Motion for Summary Judgment**

    A.  Plaintiff's Maximum Entitlement to Statutory Damages

In the Complaint, pursuant to Count 4, IQ seeks the greater of actual damages or statutory damages for copyright infringement. The parties do not dispute that Plaintiff has subsequently elected to seek statutory damages for copyright infringement under 17 U.S.C. § 504(c)(1). The parties also agree that Plaintiff is not entitled to statutory damages in regard to the Capital Care ad. Wiesner asks the Court to determine simply whether Plaintiff is entitled to one or multiple statutory damage awards if infringement of the NSAC ad is proven, under 17 U.S.C. § 504(c). Wiesner contends that only one award of statutory damages is available under this statute. IQ does not address the question of number in its responsive brief, which argues only that it is entitled to statutory damages under 17 U.S.C. § 504(c). In the Complaint, IQ seeks statutory damages "for each E-mail sent by the defendants in violation of 17 U.S.C. § 1202," but does not quantify its request for damages under 17 U.S.C. § 504(c) as to each email. (Compl. 9.) Because IQ takes no position as to how many damage awards it seeks, there may be no controversy between the parties on this matter.

Wiesner asks the Court for summary judgment on a question that is speculative rather than the subject of a live dispute. The Constitution requires that a "case or controversy" be before a court; judgment on a hypothetical issue is advisory, and federal courts may not render advisory opinions. Herb v. Pitcairn, 324 U.S. 117, 126 (1945) ("We are not permitted to render an advisory opinion.") Wiesner implicitly acknowledges the advisory nature of the relief sought here in stating that this motion is "in order to assist the parties in a proper valuation of this case." (Def.'s Br. Supp. S. J. 16.)

Alternatively, issues of damages are not ready for resolution before the predicate infringement has been determined: under 17 U.S.C. § 504, only an infringer is liable for damages, and there has been no judgment of infringement.

Summary judgment on this question is denied, as the issue is not ripe for consideration.

    B.    Plaintiff's DMCA Claim

Pursuant to Count 4 of the Complaint, IQ alleges that Wiesner violated the DMCA, 17 U.S.C. § 1202. The parties do not dispute that, in reproducing and distributing the NSAC and Capital Care ads, Wiesner removed the IQ logo and the "Legal Notice" hyperlink. IQ claims that this constitutes actionable 1) removal of copyright management information under § 1202(b)(1); 2) distribution of false copyright management information under § 1202(a)(2); 3) distribution of copyright management information knowing that the copyright management information has been removed, under § 1202(b)(2); and 4) distribution of copies of works knowing that the copyright management information has been removed, under § 1202(b)(3). Wiesner argues that the logo and hyperlink cannot fall within the scope of the statute, as set out in 17 U.S.C. § 1202(c), and asks the Court to rule on this as a matter of law.

The DMCA provision at issue, 17 U.S.C. § 1202(c), defines "copyright management information" in eight categories. IQ contends that the logo falls within category 2 ("[t]he name of, and other identifying information about, the author of a work"), category 3 ("[t]he name of, and other identifying information about, the copyright owner of the work"), and category 7 ("[i]dentifying numbers or symbols referring to such information or links to such information"). IQ contends as well that the hyperlink falls within categories 3 and 7, and that the hyperlink points to a website containing information falling within category 6 ("[t]erms and conditions for use of the work").

Wiesner asks the Court to rule, as a matter of law, that a logo cannot constitute copyright management information, as defined by 17 U.S.C. § 1202(c). IQ does not argue that the logo is a name, but that it is identifying information about a name of an author or copyright owner, as well as an identifying symbol. IQ provides no legal authority for its propositions.

IQ's arguments that the logo and hyperlink are within the scope of § 1202 fail for two reasons. First, as to the logo, IQ's position impermissibly blurs the distinction between trademark law and copyright law. Second, properly interpreted, § 1202 does not apply to either the logo or the hyperlink, under these facts.

> 1.   *The DMCA in the framework of trademark and copyright law*

In effect, IQ asks this Court to construe the DMCA so as to allow a logo, functioning as a service mark, to come within the definition of copyright management information which, by operation of the DMCA, would act to protect the copyright of its owner. This construction of the DMCA would allow trademarks to invoke DMCA provisions meant to protect copyrights. As discussed infra, this turns the DMCA into a species of mutant trademark/copyright law, blurring

the boundaries between the law of trademarks and that of copyright.  There is no evidence that Congress intended such an extreme outcome in enacting the DMCA.

A logo, to the extent that it communicates source-distinguishing information about whatever it is attached to, operates as a trademark or service mark.  As IQ appears to use its logo to indicate itself as the source of the advertising services it provides, it would operate as a service mark.  The Lanham Act defines a service mark as "any word, name, symbol, or device, or any combination thereof . . . used . . . to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."  15 U.S.C. § 1127.  Under this definition, the mark *identifies* the services so as to distinguish them from those of others, but merely *indicates* the source.

Looking only at the literal language of the statute, IQ's construction is not implausible: a logo in an email, to the extent that it operates as a trademark or service mark, could communicate information that indicates the source of the email.  It is a symbol that refers to identifying information, so a very broad interpretation of § 1202(c) might conceivably include a logo.  The problem is that this construction allows a trademark to invoke DMCA protection of copyrights, eliminating the differentiation of trademark from copyright that is fundamental to the statutory schemes.  If every removal or alteration of a logo attached to a copy of a work gives rise a cause of action under the DMCA, the DMCA becomes an extension of, and overlaps with, trademark law.

The Supreme Court cautioned against blurring the boundaries between trademark law and copyright law in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003).  In Dastar, Twentieth Century Fox argued for an interpretation of the Lanham Act that would have

8

established a cause of action under trademark law for "misrepresentation of authorship of noncopyrighted works." Id. at 35.  The Court reasoned that this would cause an overlap with copyright law and rejected it: "The problem with this argument according special treatment to communicative products is that it causes the Lanham Act to conflict with the law of copyright, which addresses that subject specifically. . . .Thus, in construing the Lanham Act, we have been careful to caution against misuse or over-extension of trademark and related protections into areas traditionally occupied by patent or copyright." Id. at 33-34.  The Court warned that disregarding the trademark/copyright law distinction "would create a species of mutant copyright law." Id. at 34.

   Here, IQ argues for an interpretation of copyright law that, similarly, would make the two legal schemes overlap.  But rather than an interpretation of the Lanham Act, as in Dastar, IQ here seeks an interpretation of the DMCA that would blur the boundaries between copyright and trademark.  Following Dastar, this Court rejects this argument.

   Furthermore, "intellectual property owners should not be permitted to recategorize one form of intellectual property as another." Chosun Int'l v. Chrisha Creations, Ltd., 413 F.3d 324, 328 (2d Cir. 2005).  Although IQ has not argued that the logo is a service mark, logos are usually considered to invoke trademark protection, not copyright protection.  IQ should not be permitted to recategorize its mark so as to invoke copyright protection.

   If this Court were to recategorize the mark so as to invoke copyright protection, it would lead to another problem: Wiesner observes that the original ads contained not only the IQ logo, but the logos for NSAC and Capital Care as well.  Following IQ's argument, these logos could serve as copyright information as well.  We could end up with a document with conflicting

9

copyright information.  IQ's argument could lead to absurd results.

        2.     *The DMCA: Statutory Interpretation of § 1202*

The statutory interpretation of § 1202 is a matter of first impression, as no courts have reported cases addressing the definition of "copyright management information."  In the reported cases involving § 1202, courts have denied application of the statute based on failure to prove the knowledge or intent requirements for violation.  See Ward v. Nat'l Geographic Soc'y, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002); Schiffer Publ'g, Ltd. v. Chronicle Books, LLC, 2004 U.S. Dist. LEXIS 23052 (E.D. Pa. 2004); Kelly v. Arriba Soft Corp., 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999).

The text of § 1202 appears to define "copyright management information" quite broadly, to the point that the section, read literally, applies wherever any author has affixed anything that might refer to his or her name.  Examination of the legislative history, as well as extrinsic sources, however, shows that the statute should be subject to a narrowing interpretation.

Law professor Julie E. Cohen has written widely on the DMCA and on copyright management information.  See generally Julie E. Cohen, Copyright and The Jurisprudence of Self-Help, 13 Berkeley Tech. L.J. 1089 (1998).  Cohen explains that, traditionally, authors have relied on copyright law to define and protect their legal rights.  Now, however, new technologies can control access to works, such that technology attached to the work itself defines and protects the legal rights of the copyright owner.  The DMCA directly protects not the copyrights, but the technological measures that protect the copyrights.  In Cohen's view, copyright management

information ("CMI") is limited to components of such technological measures.[1] This central insight is confirmed by examination of the history of § 1202.

It is frequently stated that Congress enacted the DMCA in order to implement the World Intellectual Property Organization ("WIPO") Copyright Treaty and the WIPO Performances and Phonograms Treaty. H.R. Rep. No. 105-551 (1998). It is true that enactment of the DMCA brought United States copyright law into compliance with these treaties. Id. Thus, the WIPO treaties are useful in understanding § 1202.

The WIPO treaties mandated protection of copyright management information. According to Severine Dusollier, WIPO protected CMI as part of "a double protection for technical measures." S. Dusollier, Some Reflections on Copyright Management Information and Moral Rights, 25 Colum. J.L. & Arts 377, 382 (2003). In the framework of the WIPO treaties, technical measures such as CMI are components of automated copyright protection systems: "As digital identification systems and other technologies that enable the marking and protection of works have started to develop, rightholders have feared that these technological tools might themselves be cracked by other technologies or machines, or that they might be easily modified or removed." Id. The WIPO treaties, and hence the DMCA, protect CMI so as to protect the technological measures of copyright protection themselves. This echoes the understanding of the DMCA expressed by Cohen, supra.

Although many view the DMCA as implementing the WIPO treaties, in fact, §§ 1201 and 1202 were drafted prior to the treaties. President Clinton established the Information

---

[1] See also Julie E. Cohen, A Right to Read Anonymously: A Closer Look at 'Copyright Management' in Cyberspace, 28 Conn. L. Rev. 981, 984 (1996) ("new digital monitoring and metering technologies define the burgeoning field of 'copyright management'").

11

Infrastructure Task Force in 1993 with the mandate to develop comprehensive information technology policies and programs that would promote the development of the national information infrastructure ("NII").  The Working Group on Intellectual Property Rights, Intellectual Property and the National Information Infrastructure, executive summary (1995). "The Working Group on Intellectual Property Rights was established within the Information Infrastructure Task Force to examine the intellectual property implications of the NII and make recommendations on any appropriate changes to U.S. intellectual property law and policy."  Id. The Working Group held extensive hearings and wrote the Report of the Working Group on Intellectual Property Rights, just cited.

Released in September, 1995, and known as the "White Paper," the Report presented a draft of §§ 1201 and 1202, and discussed the rationale for these sections:

> Systems for managing rights in works are being contemplated in the development of the NII. These systems will serve the functions of tracking and monitoring uses of copyrighted works as well as licensing of rights and indicating attribution, creation and ownership interests. A combination of file- and system-based access controls using encryption technologies, digital signatures and steganography[2] are, and will continue to be, employed by owners of works to address copyright management concerns. Such security measures must be carefully designed and implemented to ensure that they not only effectively protect the owner's interests in the works but also do not unduly burden use of the work by consumers or compromise their privacy. And measures should be studied to ensure that systems established to serve these functions are not readily defeated.
>
> To implement these rights management functions, information will likely be included in digital versions of a work (i.e., copyright management information) to inform the user about the authorship and ownership of a work (e.g., attribution information) as well as to indicate authorized uses of the work (e.g., permitted use information). For instance, information may be included in an 'electronic envelope' containing a work that provides information regarding authorship, copyright ownership, date of creation or last modification, and terms and

---

[2] As explained in the Report, steganography is digital watermarking.  (Id. 188.)

> conditions of authorized uses. As measures for this purpose become incorporated at lower levels (e.g., at the operating system level), such information may become a fundamental component of a file or information object.
>
> Once information such as this is affiliated with a particular information object (e.g., data constituting the work) and readily accessible, users will be able to easily address questions over licensing and use of the work. For example, systems for electronic licensing may be developed based on the attribution or permitted use information associated with an information object.

(Id. 191-192.)

The White Paper understood "copyright management information" to be information about authorship, ownership, and permitted uses of a work that is included in digital versions of the work so as to implement "rights management functions" of "rights management systems." Such systems are conceived of as electronic and automated within the environment of a computer network.

As a model rights management system, the White Paper points to the Library of Congress' Electronic Copyright Management System, as described in R.E. Kahn, Deposit, Registration and Recordation in an Electronic Copyright Management System, Proceedings of Technical Strategies for Protecting Intellectual Property in the Networked Multimedia Environment, Interactive Multimedia Assoc. (Jan. 1994). This paper describes the operation of an automated rights management system within a computer network environment. This system would automate the process of granting usage rights online, providing "automated rights clearance . . . which would accelerate permissions and royalty transfers between users and rightsholders." Id. This could produce the "effect of creating an instant electronic marketplace for such information." Id.

The White Paper demonstrates that the Working Group on Intellectual Property Rights, in

drafting § 1202, understood this section to protect the integrity of automated copyright management systems functioning within a computer network environment. This interpretation is confirmed by contemporaneous commentary:

> The prerequisite to enforcement on the information superhighway is the ability to discover incidents of electronic infringement and identify the person(s) responsible. One step in this direction is the development of methods for the authentication and identification of copyrighted works transmitted over the information superhighway. . . The use of copyright identification information will be to no avail, however, if sophisticated infringers simply alter or destroy this information. Recognizing this problem, the Working Group recommends, as part of its proposal to add a new chapter 12 to the Copyright Act, a provision that would prohibit and impose criminal penalties for the fraudulent use, removal, or alteration of copyright management information.

Jessica R. Friedman, A Lawyer's Ramble Down the Information Superhighway: Copyright, 64 Fordham L. Rev. 705, 719 (1995).

The draft legislation presented in the White Paper was introduced in both houses of Congress immediately upon its release as the "The National Information Infrastructure Copyright Protection Act" ("NIICPA").  See Julie E. Cohen, A Right to Read Anonymously: A Closer Look at 'Copyright Management' in Cyberspace, 28 Conn. L. Rev. 981, 989 (1996). As Congress developed the DMCA, the NIICPA was incorporated into it. Sections 1201 and 1202 underwent no significant revision between drafting in 1995 and enactment in 1998 under section 103 of the DMCA, Public Law 105-304.

The Congressional committees which considered the DMCA published a number of reports on the Act relevant to §§ 1201 and 1202. There is little discussion, however, of § 1202. The Senate Committee Report provides this commentary:

> Rights management information is 'information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work . . . which is attached to a copy of a work

14

> or appears in connection with communication of the work to the public.' Art. 12. Rights management information is more commonly referred to in the U.S. as copyright management information (CMI). The purpose of CMI is to facilitate licensing of copyright for use on the Internet and to discourage piracy.
>
> Copyright Management Information (CMI) is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation. Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership.
>
> Under the bill, CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and director. CMI need not be in digital form, but CMI in digital form is expressly included.

S. Rep. No. 105-190 (1998) . Viewed alone, this gives only a vague idea as to what copyright management information is and how it functions. It is, however, consistent with the understanding established supra, as it emphasizes the role of such information in facilitating licensing on the Internet, discouraging piracy, and establishing an efficient Internet marketplace. There is nothing to suggest that the Senate Committee understood § 1202 differently from the Working Group, as protecting the integrity of automated copyright management systems functioning within a computer network environment.

Similarly, the House Committee stated: "A new 'Section 1202' to the Copyright Act is required by both WIPO Treaties to ensure the integrity of the electronic marketplace by preventing fraud and misinformation." H.R. Rep. No. 105-551 (1998). This committee report, in addressing a different DMCA section, states: "It may, in appropriate circumstances include the absence of customary indicia of ownership or authorization, such as a standard and accepted digital watermark or other copyright management information." Id. This shows that Congress viewed a digital watermark as an example of copyright management information.

One company that performs digital watermarking provides this definition: "digital

watermarking technologies allow users to embed into audio, images, video and printed documents a digital code that is imperceptible during normal use but readable by computers and software." Digimarc, About Digital Watermarking, http://www.digimarc.com/watermark/about/ (last visited Dec. 20, 2005). Again, these references show an understanding of § 1202 and copyright management information as involving automated copyright management systems functioning within a computer network environment.

The legislative history is otherwise helpful in showing how Congress understood the DMCA as a whole. The committee reports show that Congress intended the DMCA to apply to "electronic commerce" and the "electronic marketplace" (H.R. Rep. No. 105-551 (1998)) and to "digital networks" (S. Rep. No. 105-190 (1998)). Furthermore, the reports show that Congress viewed §§ 1201 and 1202 together as preventing circumvention of the "technological measures" referred to in § 1201: "Subsection (a) of Section 103 thus amends title 17 to establish this new Chapter 12 to the Copyright Act to protect against certain acts of circumvention of technological measures employed by copyright owners to defend against unauthorized access to or copying of their works." Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998 (Comm. Print 1998).

This interpretation of § 1202 makes sense additionally because it fits § 1201 with § 1202, and with chapter 12 as a whole. The language of § 1201 expressly states that it concerns the circumvention of a "technological measure" which either "effectively controls access to a work" or "effectively protects a right of a copyright owner." These two provisions are sections within a common chapter (chapter 12, "Copyright Protection and Management Systems") and are the two

provisions covered by the remedies and penalty provisions of §§ 1203 and 1204. Chapter 12, as a whole, appears to protect automated systems which protect and manage copyrights. The systems themselves are protected by § 1201 and the copyright information used in the functioning of the systems is protected in § 1202.

This interpretation fits well with statements in the legislative history about the historical context of the DMCA. Congress intended the DMCA to modernize copyright protection as a response to the development of new technologies which both enabled new forms of copyright protection as well as new forms of copyright infringement. As observed by Cohen and discussed supra, traditionally, the rights of authors have been managed by people, who have controlled access and reproduction. Through scientific advances, we now have technological measures that can control access and reproduction of works, and thereby manage the rights of copyright owners and users. Section 1202 operates to protect copyright by protecting a key component of some of these technological measures. It should not be construed to cover copyright management performed by people, which is covered by the Copyright Act, as it preceded the DMCA; it should be construed to protect copyright management performed by the technological measures of automated systems.

Under this interpretation of § 1202, this Court must determine whether the information removed by Wiesner from the NSAC and Capital Care ads functioned as a component of an automated copyright protection or management system. IQ has presented no evidence on this matter that creates a genuine issue as to a material fact for trial. This Court finds no genuine issue as to a material fact and therefore Wiesner is entitled to judgment as a matter of law.

Although the advertisements were sent via email, and thus likely copied and distributed

as part of an automated process within a computer network environment, this does not bring the information removal within § 1202. To come within § 1202, the information removed must function as a component of an automated copyright protection or management system. IQ has not alleged that the logo or the hyperlink were intended to serve such a function. Rather, to the extent that they functioned to protect copyright at all, they functioned to inform people who would make copyright management decisions. There is no evidence that IQ intended that an automated system would use the logo or hyperlink to manage copyrights, nor that the logo or hyperlink performed such a function, nor that Wiesner's actions otherwise impeded or circumvented the effective functioning of an automated copyright protection system.

Because the IQ logo removed by Wiesner did not function as a component of an automated copyright protection or management system, it does not fall within the definition of "copyright management information" in 17 U.S.C. § 1202(c). With regard to the IQ logo in the NSAC and Capital Care ads, Wiesner has not violated any part of 17 U.S.C. § 1202.

IQ also claims that Wiesner violated § 1202 by removal of the hyperlink. Provision § 1202(c)(7) expressly protects links. Under this Court's interpretation of § 1202, this Court must determine whether the information removed by Wiesner functioned as a component of an automated copyright protection or management system. IQ has presented no evidence on this matter that creates a genuine issue as to a material fact for trial. This Court finds no genuine issue as to a material fact and therefore Wiesner is entitled to judgment as a matter of law. Because the hyperlink removed by Wiesner did not function as a component of an automated copyright protection or management system, it does not fall within the definition of "copyright management information" in 17 U.S.C. § 1202(c). With regard to the hyperlink in the NSAC

and Capital Care ads, Wiesner has not violated any part of 17 U.S.C. § 1202.

Count 4 of the Complaint states a cause of action against Wiesner for violation of the DMCA, 17 U.S.C. § 1202. This Court grants summary judgment in favor of Defendant Wiesner on Count 4. Plaintiff's motion for summary judgment on Count 4 is denied.

### III.     Plaintiff's Motion for Summary Judgment

####         A.     Plaintiff's Motions Regarding Copyright Infringement Under the Copyright Act

Plaintiff moved for summary judgment as to infringement of the copyright on the NSAC ad, as to its entitlement to statutory damages for this infringement, and as to its entitlement to statutory damages for willful infringement of this copyright. The issues of entitlement to statutory damages require, as a predicate, a determination of copyright infringement. "The elements of a copyright infringement action are (1) ownership of a valid copyright and (2) copying by the alleged infringer." Masquerade Novelty v. Unique Indus., 912 F.2d 663, 667 (3d Cir. 1990).

In response, Wiesner points to the evidence submitted by Defendant NSAC in support of the claim that IQ's copyright on the NSAC ad is invalid. (Def.'s Reply Br. 5.) "[A] plaintiff's knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and incapable of supporting an infringement action." Masquerade, 912 F.2d at 667. NSAC has argued that Alan Mott is the true author and owner of the NSAC ad and that IQ obtained its registration by fraud. (NSAC Br. Supp. S.J. 13.) Wiesner points as well to the affidavit of Alan Mott in which he declares his authorship of the NSAC ad. (Mott Aff. ¶ 15.)

IQ argues that its copyright registration is prima facie evidence of the validity of the

copyright.  While true, this does no more than create a rebuttable presumption in its favor. Educational Testing Services v. Katzman, 793 F.2d 533, 538 (3d Cir. 1986).  The prima facie presumption of validity does not entitle IQ to summary judgment in the face of a genuine issue as to a material fact that could rebut that presumption.  Wiesner has pointed out actual evidence before this Court that creates a genuine issue as to the material fact of authorship, and thus the validity of the copyright registration, for trial.  IQ's argument that a legal presumption operates in its favor does not nullify the existence of this genuine issue as to a material fact.  Plaintiff's motion for summary judgment as to infringement of the copyright on the NSAC ad, as to its entitlement to statutory damages for this infringement, and as to its entitlement to statutory damages for willful infringement of this copyright, is denied.

## **CONCLUSION**

For the foregoing reasons, this Court grants Defendant Wiesner's motion for summary judgment, pursuant to Count 4 of the Complaint, for violations of 17 U.S.C. § 1202; Wiesner has not violated 17 U.S.C. § 1202.  Plaintiff's motion for summary judgment as to violations of 17 U.S.C. § 1202 is denied.  Wiesner's motion for summary judgment as to Plaintiff's maximum entitlement to statutory damages is denied.  Plaintiff's motion for summary judgment on infringement of the copyright on the NSAC ad, and entitlement to statutory damages for any such copyright infringement, is denied.

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: January 10, 2006